1
2
3
4
5
6
7
8        **IN THE UNITED STATES DISTRICT COURT**
9        **FOR THE EASTERN DISTRICT OF CALIFORNIA**
10
11  MONROE WALTER BURNS,                    CASE NO. CV-F-04-6409 LJO DLB HC
12              Petitioner,                 FINDINGS AND RECOMMENDATION
                                            REGARDING PETITION FOR WRIT OF
13        vs.                               HABEAS CORPUS
14  A.P. KANE, Warden,                      [Doc. 42]
15              Respondent.
16  _____/
17        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant
18  to 28 U.S.C. § 2254.
19                    PROCEDURAL BACKGROUND[1]
20        On May 22, 2000, the Stanislaus County District Attorney filed a three-count information
21  charging Petitioner with three felonies: petty theft with a prior robbery (Cal. Pen. Code §§ 494(a),
22  666; count 1); assault by means of force likely to produce great bodily injury (Cal. Pen. Code §
23  245(a)(1); count 2); and assault with a deadly weapon (Cal. Pen. Code § 245(a)(1); count 3).  It was
24  further alleged that Petitioner had been convicted of two prior serious felonies – robbery and
25  kidnapping in 1991 - for purposes of California's Three Strikes law.  (Cal. Pen. Code §§ 667(d),
26  1192.7(c).)  As to each count, it was also alleged that Petitioner had served a prior prison term within
27
28        _____
          [1]  This information is derived from the petition for writ of habeas corpus and Respondent's answer.

                              1

1   the past five years.  (Cal. Pen. Code § 667.5(b).)  (CT 39-45.)

2          On August 8, 2000, following jury trial in the Stanislaus County Superior Court, Petitioner

3   was found guilty on counts 1 and 3.  The jury found Petitioner not guilty on count 2, but guilty of the

4   lesser included offense of simple assault, a misdemeanor.  (CT 68-72; RT 122-124.)  In a bifurcated

5   proceeding, the trial court found the prior conviction allegations to be true.  (CT 69; RT 133.)

6          On January 22, 2001, Petitioner filed a motion for a new trial based on trial counsel's failure

7   to present evidence of his mental condition.  (CT 85-97.)  Petitioner also filed two motions to strike

8   the prior convictions.  (CT 108-121.)

9          On March 15, 2001, the trial court ordered a hearing regarding Petitioner's mental

10  competency pursuant to California Penal Code section 1368.  (CT 154; SRT 5.)  Following a two-

11  day trial, a jury found Petitioner mentally competent to participate in the remaining proceedings

12  against him.  (CT 162-164, 195-197; RT 398-400.)  Criminal proceedings were reinstated on July 25,

13  2001, the date of the jury's determination. (CT 202.)

14         On September 7, 2001, Petitioner was sentenced to a term of 25 years to life, plus one year,

15  under California Three Strike's law, for his conviction of assault with a deadly weapon with two

16  prior convictions.  (Lodged Doc. No. 1.)

17         Petitioner filed a timely notice of appeal.  On August 28, 2003, the California Court of

18  Appeal for the Fifth Appellate District vacated Petitioner's conviction of simple assault, but affirmed

19  the judgment in all other respects.

20         On October 10, 2003, Petitioner filed a petition for review with the California Supreme

21  Court.  (Lodged Doc. No. 6.)  On November 12, 2003, the California Supreme Court denied the

22  petition.  (Lodged Doc. No. 7.)

23         On September 22, 2004, Petitioner filed a federal petition for writ of habeas corpus in the

24  United States District Court for the Northern District of California.  The petition was transferred to

25  this Court on October 18, 2004.

26         On December 20, 2004, Respondent filed a motion to dismiss the petition as a "mixed"

27  petition containing unexhausted claims.  On January 14, 2005, the Court issued Findings and

28  Recommendations recommending that Respondent's motion be granted.  (Court Doc. 10.)  On

1    February 11, 2005, Petitioner filed objections to the recommendation and requested that the petition

2    be held in abeyance pending exhaustion of the unexhausted claims.  (Court Doc. 11.)  On July 27,

3    2005, the Court issued Findings and Recommendations recommending that Petitioner's motion to

4    stay be denied.  (Court Doc. 17.)  The Findings and Recommendations were adopted in full on

5    September 2, 2005.  (Court Doc. 19.)  Petitioner then filed a request to withdraw the entire petition

6    on September 26, 2005.  (Court Doc. 21.)  On October 13, 2005, the Court issued Findings and

7    Recommendations recommending that Petitioner's request be granted.  (Court Doc. 22.)  On

8    November 14, 2005, Petitioner filed objections, and asked the Court to withdraw his previous

9    request to withdraw the petition.  (Court Doc. 23.)  On this same date, Petitioner submitted an

10   amended petition.  (Court Doc. 26.)  On December 13, 2005, this Court vacated the Findings and

11   Recommendations, and ordered the amended petition filed.

12        On February 6, 2006, Respondent filed an answer to the amended petition.  (Court Doc. 31.)

13   Petitioner filed a traverse on March 9, 2006.  (Court Doc. 38.)

14        Prior to filing the traverse, Petitioner filed a motion to consolidate the finalized state petition

15   for writ of habeas corpus, on February 13, 2006.  The Court construed Petitioner's request as a

16   motion to amend, and granted said request on April 7, 2006.  Petitioner filed an amended petition

17   including the newly exhausted claims on May 10, 2006.  (Court Docs. 40, 42.)

18        Respondent filed a supplemental answer on June 13, 2006, and Petitioner filed a

19   supplemental traverse on July 17, 2006.  (Court Docs. 44, 45.)

20                                    STATEMENT OF FACTS

21        On October 8, 1999, Petitioner was shopping around at the HomeBase store in Modesto,

22   California, with his little daughter.  He caught the attention of store security officer, Gabriel Magana.

23   (RT 31-32.)  Magana observed Petitioner place a box containing a door knob lock in his shopping

24   cart.  (RT 31-32; CT 51.)  Magana then proceeded to the nursery department of the store, and placed

25   a plant in his cart.  From approximately 50 feet away, Magana then observed Petitioner stuff the lock

26   set box under his shirt behind his waistband.  (RT 33-34.)  His shirt was hanging over his waistband

27   concealing the item.  (Id.)  Petitioner then went through the check out line.  Magana called his

28   supervisor, Ramsey Keo, and asked for assistance in stopping Petitioner outside the store.  (RT 34.)

                                              3

1   Magana continued to watch Petitioner as he purchased the plant and left the store.  (RT 33-35.)

2        Magana, who was wearing plain clothing, briskly walked toward Petitioner, identified

3   himself as store security, slightly grabbing Petitioner's arm, and requested that Petitioner return the

4   merchandise.  (RT 35-37.)  Magana pointed to Petitioner's waistband, Petitioner pulled out the box

5   and threw it at Magana, striking him in the face causing a cut just above his left eyebrow, and

6   Petitioner took off running.  (RT 37-39, 49.)  Magana testified that the box set was thrown in an

7   overhand motion, described by the court as a "circular movement, a little wind up for a baseball."

8   (RT 38.)  When the box was thrown, Magana estimated he was between two and four feet away.

9   (RT 37.)  After being hit with the lock set box, Magana heard the pieces of the metal door knob

10  scatter as it fell to the ground.  (RT 54.)

11       As Petitioner fled on foot, Magana chased him.  After approximately a quarter of a mile,

12  Magana caught up to Petitioner, wrestled him to the ground and handcuffed him.  (RT 39-41.)

13  Magana was assisted by another store security officer, Ramsey Keo, who witnessed the incident and

14  also joined the chase, putting Petitioner into a headlock.  (RT 41-42, 61-65.)

15       Magana wrote a report approximately an hour and a half after the incident occurred.  Magana

16  wrote that Petitioner "threw the lock at me and hit me above the left eye with it."  (RT 50, 55-56.)

17  During cross-examination, Magana acknowledged that he might have been attempting to grab the

18  box from Petitioner's waist prior to being hit with it.  (RT 52.)  Magana agreed that the injury was

19  minor, although it was painful and caused some bleeding.  (RT 52, 55.)

20       Ramsey Keo testified that prior to the incident and in response to Magana's request for

21  assistance, he was standing outside by the main exist.  (RT 60-62.)  He observed Magana approach

22  Petitioner and observed Petitioner take the lock set from his pants, make an overhand motion toward

23  Petitioner and struck Magana with it.  (RT 64, 66.)  Keo, was approximately 25 feet away, and could

24  not tell if Petitioner still had the box in his hand or had just released it when it hit Magana in the

25  face.  (RT 67.)  However, he testified that Petitioner "took out the box and hit Mr. Magana with it."

26  (RT 68.)

27  ///

28  ///

4

DISCUSSION

A.      Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of the Stanislaus County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct. 1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.      Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The AEDPA altered the standard of review that a federal habeas court must apply with respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v. Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's

1   approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct.

2   1495, 1523 (2000).  "A federal habeas court may not issue the writ simply because that court

3   concludes in its independent judgment that the relevant state-court decision applied clearly

4   established federal law erroneously or incorrectly."  Lockyer, at 1175 (citations omitted).  "Rather,

5   that application must be objectively unreasonable."  Id. (citations omitted).

6        While habeas corpus relief is an important instrument to assure that individuals are

7   constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983);

8   Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal

9   conviction is the primary method for a petitioner to challenge that conviction.  Brecht v.

10  Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's factual

11  determinations must be presumed correct, and the federal court must accept all factual findings made

12  by the state court unless the petitioner can rebut "the presumption of correctness by clear and

13  convincing evidence."  28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769

14  (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380,

15  1388 (9th Cir. 1997).

16  C.   Instructional Error

17       Petitioner contends that the trial court violated his constitutional rights by failing to instruct

18  the jury sua sponte on the defense of accident or misfortune, pursuant to CALJIC No. 4.45.

19        As a general proposition, "a defendant is entitled to an instruction as to any recognized

20  defense for which there exists evidence sufficient for a reasonable jury to find in his favor."

21  Mathews v. United States, 485 U.S. 58, 63 (1988) (citation omitted).  The failure to adequately

22  instruct the jury on the defendant's theory of defense "may deprive the defendant of his due process

23  right to present a defense." Bradley v. Duncan, 315 F.3d 1091, 1099 (9th Cir. 2002).  Conversely, "a

24  defendant is not entitled to a jury instruction on a defense theory unless there is some evidence

25  before the jury to support it."  United States v. Bowman, 720 F.2d 1103, 1005 (9th Cir. 1983).  In

26  addition, "[i]t is not reversible error to reject a proposed defense instruction on his theory of the case

27  if other instructions, in their entirety, adequately cover that defense theory."  United States v. Mason,

28  902 F.2d 1434, 1438 (9th Cir. 1990).

1    Under California law, assault with a deadly weapon is a general intent crime, and the intent

2    required is the same as that to commit a battery, defined as "any willful and unlawful use of force or

3    violence upon the person of another." People v. Colantuono, 7 Cal.4th 206, 214 (1994) (citing Cal.

4    Pen. Code § 242).  A defendant need not have any intent to injure the victim.  Id.  Rather, a

5    defendant "must be aware of facts that would lead a reasonable person to realize that a battery would

6    directly, naturally and probably result from his conduct." People v. Williams, 26 Cal.4th 779, 788

7    (2001).

8    The defense of accident "is a claim that the defendant acted without forming the mental state

9    necessary to make his actions a crime." People v. Gonzalez, 74 Cal.App.4th 382, 390 (1999).

10   CALJIC No. 4.45 instructs the jury as follows:

11   When a person commits an act or makes an omission through misfortune or by
     accident under circumstances that show [no] [neither] [criminal intent [n]or purpose,]
12   [nor] [[criminal] negligence,] [he] [she] does not thereby commit a crime.

13

14   Petitioner contends that the evidence supported that he "had merely been tossing the stolen

     merchandise back to [Magana] as a diversionary tactic with no intent to do harm," and any resulting
15
     injury was accidental.  Petitioner therefore argues that the defense of accident or misfortune was
16
     produced through evidence of cross-examination and argument by defense counsel.
17
     In rejecting Petitioner's claim on direct appeal, the Court of Appeal stated:
18
19   [Petitioner] claims he had no intention of hitting Magana, i.e., he threw the
     lockset *to* Magana rather than *at* him, and it was purely by accident that it hit him.
20   This accident defense, he maintains, is supported by substantial evidence, "adduced
     through cross-examination and argued in closing by defense counsel."  Of course,
     counsel's arguments to the jury were merely the theory, not the proof of it.  And
21   defense counsel, despite her persistent efforts to get Magana to testify [Petitioner] had
     thrown the lockset to him, failed conspicuously.  Asked specifically to resolve the
22   issue, Magana testified he believed [Petitioner] threw the lockset *at* him, not *to* him.
     Therefore, in the absence of any evidence to support it, the court was not required to
23   give an accident or misfortune instruction.

24   (Lodged Doc. No. 5, Opinion, at 11-12, footnote omitted.)

25   Petitioner was convicted of assault on security guard Magana by throwing the lock set at him.

26   At trial, defense counsel cross-examined Magana and attempted to suggest that Petitioner did not

27   throw the door knob in an overhand motion.  (RT 50-51, 69.)  Defense counsel repeatedly referred to

28   Petitioner's action as throwing the box *to*, not *at*, the security guard.  However, as stated by the Court

7

1   of Appeal, Magana's *unequivocal* testimony was that the lock set was thrown *at*, not *to* him.

2       Furthermore, as recognized by the Court of Appeal, the fact that Petitioner did not intend to

3   injure Magana is not a defense to the assault charges because the Petitioner "need not be subjectively

4   aware of the risk that a battery might occur." People v. Williams, 26 Cal.4th 779, 788 (2001)

5   (footnote omitted.)  Any statement by defense counsel to the contrary was simply a misstatement of

6   the law.  (Lodged Doc. No. 5; Opinion, at 11-12 n.5.)  The state courts' determination of this issue

7   was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

8   D.    Insufficient Evidence to Support Conviction of Assault With Deadly Weapon

9       Petitioner contends that there was insufficient evidence to support his conviction on Count 3

10  of assault with a deadly weapon.  More specifically, Petitioner contends that the evidence at trial was

11  insufficient to prove that the manner in which he used the lock set box rendered it capable and likely

12  to produce great bodily injury.

13      The law on insufficiency of the evidence claim is clearly established.  The United States

14  Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a

15  federal court must determine whether, viewing the evidence and the inferences to be drawn from it in

16  the light most favorable to the prosecution, any rational trier of fact could find the essential elements

17  of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Sufficiency

18  claims are judged by the elements defined by state law.  Id. at 324, n. 16.

19      _____In rejecting Petitioner's claim on direct appeal, the California Court of Appeal stated:

20          [N]umerous facts support the jury's determination. [Petitioner] threw the
            lockset in an overhand motion.  He threw it at Magana's head from only a few feet
21          away.  He threw it with sufficient force to open a cut over the eye, a particularly
            vulnerable area.  The lockset was metal.  The fact that the injury was minor is not
22          critical as the force used need not even produce injury. (People v. Fierro (1991) 1
            Cal.4th 173, 251.)  In determining whether an object not inherently deadly or
23          dangerous is used as such, the trier of fact may consider all facts (such as those listed
            above) relevant to the issue.  (Aguilar, supra, 16 Cal.4th at p. 1029.)
24
    Lodged Doc. No. 5.; Opinion, at 9.
25
        Sufficient evidence supports Petitioner's conviction of assault with a deadly weapon, and the
26
    state courts' determination of this issue was not contrary to, or an unreasonable application of,
27
    clearly established Supreme Court precedent.  The evidence viewed in the light most favorable to the
28

8

1   prosecution, amply supports the jury's finding that Petitioner was guilty of assault with a deadly

2   weapon.

3        Under California law, an object in and of itself need not be inherently deadly or dangerous to

4   be classified as a deadly weapon.  A "deadly weapon" is defined as "any object, instrument, or

5   weapon which is used in such a manner as to be capable of producing and likely to produce, death or

6   great bodily injury."  People v. Aguilar, 16 Cal.4th 1023, 1028-29 (1997); see also Cal. Pen. Code §

7   245(a)(1).  To determine if an object is a deadly or dangerous weapon, "the trier of fact may consider

8   the nature of the object, the manner in which it is used, and all other facts relevant to the issue."  Id.

9   at 1029.

10       Here, although the lock set is not a typical object customarily used as a deadly weapon, as

11  submitted by Respondent, California courts have found several household items to be deadly weapon

12  when used under certain circumstances.  See People v. Fierro, 1 Cal.4th 173, 251 (1991) (telephone

13  receiver); People v. Simons, 42 Cal.App.4th 1100, 1107 (1996) (screwdriver); People v. Curcio, 255

14  Cal.App.2d 183, 190 (1967) (can opener); People v. Helms, 242 Cal.App.2d 476, 486-87 (1966)

15  (pillow); People v. Russell, 59 Cal.App.2d 660, 665 (1943) (fingernail file).  In addition, other items,

16  such as a chain, liquor bottle, or large rock, can be considered a deadly weapon when used to inflict

17  harm.  See People v. Montes, 74 Cal.App.4th 1050, 1054 (1999) (chain); People v. Snyder, 11

18  Cal.App.4th 389, 393 (1992) (liquor bottle); People v. White, 212 Cal.App.2d 464 (1963) (large

19  rock).

20       In this case, the lock set thrown by Petitioner at Magana was a box consisting of a metal door

21  knob and other hardware.  (RT 63-64.)  Magana's testimony reflected that Petitioner threw the box at

22  him from close range in an overhand motion, as if he were hurling a baseball.  (RT 38.)  Keo testified

23  unequivocally that Petitioner raised the box over his shoulder before it came in contact with

24  Petitioner, although he was not sure if the box left Petitioner's hand before striking Magana.  (RT

25  64.)  After the lock set box hit Magana above the left eye, it hit the ground and scattered in pieces.

26  (RT 54.)  Thus, it is reasonable to infer that Petitioner hurled the box with sufficient force capable

27  and likely to produce great bodily injury.  In some circumstances, the nature and extent of the

28  injuries may demonstrate whether the use of an ordinary object is a deadly weapon or instrument as

9

1   defined by Penal Code section 245(a), such is not the case here.  Although Magana acknowledged

2   that the cut he received as a result of the lock set was minor, this does not diminish the fact that the

3   evidence established that Petitioner removed the lock set from his waistband, hurled it in a

4   continuous motion at Magana, who had not time to defend.  As stated by the state appellate court, the

5   metal lock set box was thrown at close range, with sufficient force to "open a cut over [Magana's]

6   eye, and scattered into pieces when hitting the ground, all supporting the jury's finding of guilt of

7   assault with a deadly weapon.  Therefore, sufficient evidence supports the jury's finding that under

8   these circumstances an object such as a lock set door knob constituted a deadly weapon because it

9   was used in a manner capable of producing death or great bodily injury.

10  E.      Trial Court Violation of Constitutional Rights by Directing Victim to Demonstrate How
            Petitioner Assaulted Him

11
12          Petitioner contends that the trial court erred under state law and deprived him of his federal

13  constitutional right to due process and a fair trial when it directed Magana to demonstrate how

    Petitioner threw the lock set at him.

14
15          Absent a federal constitutional violation, a violation of state law does not provide a basis for

16  habeas relief.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  Accordingly, a state court's

17  evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state

    proceedings so fundamentally unfair as to violate due process.  Drayden v. White, 232 F.3d 704, 710

18  (9th Cir. 2000); Spivey v. Rocha, 194 F.3d 971, 977-78 (9th Cir. 1999); Jammal v. Van de Kamp, 926

19  F.2d 918, 919 (9th Cir. 1991).  If the trial court erred in admitting evidence at trial, the Court must

20  then determine whether the error had a substantial and injurious effect on the guilty verdict and

21  whether the verdict would stand absent the erroneously admitted evidence.  See Brecht v.

22  Abrahamson, 507 U.S. 619, 638 (1993).

23          Petitioner contends that the trial court should not have allowed Magana to describe how

24  Petitioner threw the lock set at him because he had previously testified that he could not describe

25  how it was thrown.  Petitioner's claim is based on the following testimony of Magana:

26              Q.   As he [Petitioner] pointed to his waistband did he pick up his shirt or how
                did that come about?
27              A.   After telling him about the merchandise, I pointed to where it was at and
                then [he] began to pick up his – after a few seconds began to pick up his shirt and
28

10

1   took the merchandise out of his waistband.

    Q.  How did he take it out? [¶] I invite you to pick up the box and show the
2   jury how he picked it up. [¶] Why don't you stand up please.

    A.  (Complied.) [¶] It was concealed right here and just – just I would say
3   about that quick.

    Q.  So he picked up the end of the box, the long end of the box in his right
4   hand, do you believe?

    A.  Yes.
5   Q.  And brought it back to about shoulder height?

    A.  Then it was such a quick motion that – I'm not going to say how it was
6   thrown.  I know it was thrown after that and it hit me above my left eye.

    Q.  How far away were you from him when he takes this thing out of his
7   pants?

    A.  I'd say about two, three feet, four feet max.
8   Q.  After this comes out of his pants, demonstrate for the jury if you would
    please what exactly he did with the similar box.
9   A.  Ummm –

    MS. AREVALO [Defense Counsel]: Objection.  The witness testified he
10  doesn't recall how it was thrown.

    THE COURT: You can answer best you can.  The objection's overruled.
11  THE WITNESS: After taking it out of his waistband, the item was picked up
    and thrown overhand and I didn't act quick enough and it hit me in my eye.  It was
12  thrown in this type of motion.  (Indicating.)

    MR. CASSIDY [Prosecutor]: You've done an overhead pass, if you will.
13  MS. AREVALO: Objection.  Leading, your Honor.

    THE COURT: Overruled.  He is attempting to put into the record.  I think the
14  jury was able to see the motion he made.  I would attempt to describe it for the record.
    [¶] He was moving his arm in a circular movement, a little wind up like for a baseball
15  is my description.

16  (RT 37-38.)

17      Contrary to Petitioner's contention, Magana never stated that he did not know how the lock

18  set was thrown at him.  Rather, at one point in his testimony he stated "I'm not going to say how it

19  was thrown," as stated by the Court of Appeal, this Court too, does not "construe Magana's

20  equivocal statement 'I'm not going to say how it was thrown' as a categoric statement that he did not

21  know." (Lodged Doc. No. 5, Opinion, at 10.)   Rather, it appears that Magana was simply at a loss

22  for words about how to describe Petitioner's actions.

23      The issue in this case was whether Petitioner threw the lock set at Magana in an attempt to

24  assault him.  The demonstration was highly relevant to whether Petitioner threw the box as a deadly

25  weapon.  The demonstration of the overhead motion depicted to the jury that the box was thrown

26  with such force to cause serious injury.  Accordingly, it was not error for the trial court to allow

27  Magana to describe how the lock set was thrown at him.

28      However, even assuming the trial court erred under state law by allowing the testimony,

11

1   Petitioner is still not entitled to habeas relief under section 2254. As stated above, the erroneous

2   admission of evidence violates a defendant's due process rights only if it violates "fundamental

3   conceptions of justice." <u>Dowling v. United States</u>, 473 U.S. 342, 352 (1990) (quoting <u>United States</u>

4   <u>v. Lovasco</u>, 431 U.S. 783, 790 (1977)). Magana's description of the assault did not violate any

5   fundamental concept of justice or result in any fundamental unfairness to Petitioner. Because the

6   facts underlying the assault were disputed by Petitioner, Magana's testimony was highly relevant and

7   there was a legitimate inference to be drawn from it. Accordingly, there can be no claim that

8   Petitioner's due process rights were violated, and the state courts' determination of this issue was not

9   contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

10   F.      Trial Court's Admission of Photograph of Victim's Cut

11           Petitioner contends that the trial court erred under state law and violated his federal

12   constitutional rights by admitting into evidence a blurry photograph of Magana's injury that allegedly

13   exaggerated the extent of the cut.

14           Absent a federal constitutional violation, a violation of state law does not provide a basis for

15   habeas relief. <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991). Accordingly, a state court's

16   evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state

17   proceedings so fundamentally unfair as to violate due process. <u>Drayden v. White</u>, 232 F.3d 704, 710

18   (9th Cir. 2000); <u>Spivey v. Rocha</u>, 194 F.3d 971, 977-78 (9th Cir. 1999); <u>Jammal v. Van de Kamp</u>, 926

19   F.2d 918, 919 (9th Cir. 1991). If the trial court erred in admitting evidence at trial, the Court must

20   then determine whether the error had a substantial and injurious effect on the guilty verdict and

21   whether the verdict would stand absent the erroneously admitted evidence. <u>See</u> <u>Brecht v.</u>

22   <u>Abrahamson</u>, 507 U.S. 619, 638 (1993).

23           At trial, defense counsel argued that the photograph was so blurry that it was not an accurate

24   depiction of the injury. (RT 16.) Although the prosecutor acknowledged that the photograph was

25   blurry, he argued that it supported Magana's testimony that he was cut above the eye. (Id.) The trial

26   court ruled that the photograph was admissible stating that while "it is not as nice as it may be . . .

27   [it] may assist the jury in their determination." (RT 17.) During trial, Magana testified that the

28   photograph depicted his injury and the photograph was admitted into evidence. (RT 43, 71.)

1    In rejecting Petitioner's claim on direct appeal, the Court of Appeal held:

2           [Petitioner] next contends the court erred by admitting a blurry photograph of
       the cut on Magana's foreherad because the photograph tended to exaggerate the extent
3      of Magana's injuries.  We wonder, however, on what basis [Petitioner] presumes to
       assert that the photograph, which is undeniably blurry, simply shows a red spot on
4      Magana's eyebrow.  So the most that can be said in objection to the photograph is that
       it provides no useful information whatsoever.  As there could obviously be no
5      prejudice from its admission, the contention is meritless.

6    (Lodged Doc. No. 5; Opinion, at 10.)

7           Because the photograph corroborated Magana's testimony about the location of the injury,

8    and showed the size of the cut and proximity to Magana's eye, it allowed the jury to draw

9    permissible inferences from it.  As Respondent submits, even assuming that the poor quality of the

10   photograph, of which the Court of Appeal highly questioned, made the injury look worse, that was a

11   question as to the weight, not the admissibility, of the evidence.  Defense counsel was free to bring

12   out any discrepancies between the photograph and Magana's testimony.  Accordingly, Petitioner's

13   due process rights were not violated by admitting the blurry photograph into evidence and

14   Petitioner's claim is without merit.

15   G.    Constitutional Right to be Examined by an Expert on Developmental Disabilities as Part of
           the Competency Proceedings
16
             Petitioner contends that the trial court denied him due process of law and a fair trial by failing
17
     to appoint the director of the regional center for the developmentally disabled or his designee to
18
     examine him during competency proceedings amid his trial.
19
             It is a violation of the Due Process Clause to require an incompetent defendant to stand trial.
20
     Cooper v. Oklahoma, 517 U.S. 348, 354 (1996); Medina v. California, 505 U.S. 437, 453 (1992);
21
     Drope v. Missouri, 420 U.S. 162, 171-172 (1975); Pate v. Robinson, 383 U.S. 375, 378 (1966).  As
22
     stated by the Supreme Court, "[a] defendant may not be put to trial unless he 'has sufficient present
23
     ability to consult with his lawyer with a reasonable degree of rational understanding . . . [and] a
24
     rational as well as factual understanding of the proceedings against him.'"  Cooper v. Oklahoma, 517
25
     U.S. at 354 (quoting Dusky v. United States, 362 U.S. 402, 402 (1960) (per curiam)).
26
             A defendant is entitled to the assistance of counsel and to present medical evidence during a
27
     competency hearing on the issue of his mental condition.  Medina v. California, 505 U.S. at 450.
28

13

1  "The Due Process Clause does not, however, require a State to adopt one procedure over another on

2  the basis that it may produce results more favorable to the accused."  Id. at 451.  "[I]t is enough that

3  the State affords the criminal defendant on whose behalf a plea of incompetence is asserted a

4  reasonable opportunity to demonstrate that he is not competent to stand trial."  Id.[2]

5          Petitioner's mental competency was first brought to light during a hearing on March 15, 2001

6  - more than seven months after Petitioner was convicted, but prior to Petitioner's sentencing hearing.

7  (SRT 4-5.)  In response to defense counsel's claims, the trial court suspended the criminal

8  proceedings, ordered that Petitioner be examined by two psychologists, and scheduled a trial on his

9  competency.[3]  (SRT 5-7; CT 154-158.)  The two examining psychologists testified during a two-day

10  jury trial, and Petitioner was found mentally competent to continue in the criminal proceedings,

11  which resumed.  (CT 162-164, 195.)

12          Petitioner claims, as he did on direct appeal, that the trial court erred under state law and

13  violated his federal constitutional rights by failing to sua sponte appoint the director of the regional

14  center for the developmentally disabled to examine him for evidence of a developmental disability.

15  Petitioner cites California Penal Code section 1369(a), which states, in pertinent part, "If it is

16  suspected the defendant is developmentally disabled, the court shall appoint the director of the

17  regional center for the developmentally disabled . . . or the designee of the director, to examine the

18  defendant."  Petitioner contends that the trial court had reason to believe that he suffered from such a

19  disability based on the records attached to his written motion for a new trial, as well as the evidence

20  produced at the competency hearing.

21          In rejecting Petitioner's claim on direct appeal, the Court of Appeal summarized the

22  proceedings and held as follows:

23          [Petitioner] argues there were two points in the proceedings below when the
        court was made aware of information that should have caused it, on its own motion,

24

25          [2]  In Medina, it was held that the California statute that places the burden of proof on a defendant to show that he
    is not competent to stand trial, rather than requiring the state to show that he is competent, does not violate due process.  505
26  U.S. at 446-52.

27          [3]  California Penal Code sections 1368 and 1369, allow for suspension of proceedings and appointment of a
    psychiatrist or licensed psychologist to examine a defendant when a doubt arises in the mind of the judge as to the mental
28  competence of the defendant.

to refer him for an evaluation to determine whether he suffered from a developmental disability. The first came at the hearing on his new trial motion. [Petitioner's] new attorney, Cornelio Hernandez, brought the motion on the ground [Petitioner's] first attorney had been ineffective for failing to raise a "mental defense" based on [Petitioner's] "psychiatric condition," which condition was described as "lengthy and severe learning disability/deficits." The motion included the following: prison records from 1995 indicating [Petitioner] had "a severe effective disorder which appears to be chronic," "a history of severe learning disability/deficits," and an IQ of 78; school records indicating [Petitioner] attended special education classes in high school; and [Petitioner's] declaration stating he had been molested by his stepfather as a child, he had been shot by police when he was younger, he was taking medication for depression at the time of the present incident, and he had attempted suicide "sometime ago. . . but . . . I did not kill myself."

At the hearing on the new trial motion, Hernandez told the court he believed [Petitioner] was "1368," and requested that he [Petitioner] be referred for a "psychiatric evaluation." The court (judge Hedegard) suspended criminal proceedings and appointed a psychologist to examine [Petitioner]. The court did not, nor was it asked to, refer [Petitioner] for an evaluation of a developmental disability.

The second point at which [Petitioner] contends the trial court should have ordered a developmental disability evaluation came at the competency hearing (held before Judge Griffin). Two psychologists had interviewed [Petitioner] in preparation for the hearing. Gary Zimmerman, Ph.D., called by the defense, testified [Petitioner] had exhibited some signs of a mental disorder, but "I could not determine whether he was malingering or whether he suffered from a significant degree of depression which hindered his ability to cooperate [with his attorney]." Zimmerman therefore recommended [Petitioner] be given "the benefit of the doubt" and sent to a state hospital where he could be evaluated more thoroughly.

Dr. Zimmerman reviewed the same information as had been attached to [Petitioner's] new trial motion. Referring to the notation in [Petitioner's] prison records that he had an IQ of 78, Zimmerman characterized this as "borderline [retardation] to low average intellectual level." Beyond that, Zimmerman expressed no opinion about whether [Petitioner] suffered from a developmental disability.

Phillip Trompetter, Ph.D., appeared for the prosecution. He testified [Petitioner] had displayed symptoms, including a "significant cognitive deficit," which, if genuine, suggested he [Petitioner] was suffering from a combination of paranoid schizophrenia and posttraumatic stress. However, for reasons he discussed at some length, Trompetter concluded the symptoms were not genuine, and [Petitioner] was malingering.

Although conceding he is not an expert on mental retardation, Dr. Trompetter explained he normally would attempt to assess that and other developmental disabilities, as well as mental disorders, in the course of a competency evaluation. He testified he had found no evidence - - "None at all" - - that [Petitioner] is retarded. Trompetter said, by way of example, that [Petitioner] displayed none of the behavior associated with retardation, and had no history of having been diagnosed with that condition. Moreover, according to Trompetter, enrollment in special education classes does not necessarily indicate that a student is retarded (as opposed to "learning handicapped"), and a "[d]iagnosis of mental retardation is only appropriate if the IQ is 70 or under."

In addition to these psycholgists, four other people testified in regard to [Petitioner's] competency. [Petitioner's] second attorney, Hernandez, testified [Petitioner] appeared to be "very slow" and to have difficulty understanding what Hernandez was telling him. Wendell Davis, [Petitioner's] cellmate, said [Petitioner] had trouble reading and writing. [Petitioner's] younger brother, Ramon McCullough, said [Petitioner] had been "slow" as a child and attended classes with "the retarded people." And Rachel Thomas, the probation officer who interviewed [Petitioner] to

15

prepare a sentencing report, testified she had encountered no problem eliciting fairly detailed information from [Petitioner] about his past (unlike the two psychologists, who testified [Petitioner] had been evasive).

[Petitioner] contends the documents attached to the new trial motion, and the testimony presented at the competency hearing, were evidence enough of a developmental disability (i.e., mental retardation) to trigger the trial court's duty to refer him for an evaluation.

> "Substantial evidence of mental incompetence is evidence that raises a reasonable doubt on the issue. [Citation.] In determining whether there is substantial evidence of incompetence, a court must consider all of the relevant circumstances, including counsel's opinion. [Citation.] '[T]he "inexactness and uncertainty" that characterize competency proceedings may make it difficult to determine whether a defendant is incompetent or malingering.' [Citation.] Thus, 'what constitutes . . . substantial evidence in a proceeding under section 1368 "cannot be answered by a simple formula applicable to all situations." [Citation.]' [Citation.]." (*People v. Castro* (2000) 78 Cal.App.4th 1402, 1415.)

[Petitioner] maintains his enrollment in special education classes, his limited ability to read and write, his "history of severe learning disability/deficits," his measured IQ of 78, and the anecdotal evidence he is "very slow," all "point to a developmental disability." Moreover, he goes on, "there [is] evidence of events in [Petitioner's] life that would impede normal mental development," including having suffered physical and sexual abuse as a child, and using drugs and alcohol. But these are merely inexpert conclusions that [Petitioner] thinks the trial court should have drawn from the evidence, not conclusions expressed by either of the experts who testified at the competency hearing. In fact, Dr. Trompetter's testimony effectively refuted them.

> ...................................................................................................................
> It appears to use that [Petitioner's] argument confuses a developmental disability with a learning disability. They are not the same thing.
> The definition of a developmental disability for purposes of determining whether a criminal defendant is competent to stand trial (§ 1370.1 subd. (a)(1)(H)) is the same as the one that appears in the Welfare and Institutions Code in connection with the provision of services by the state to persons with a developmental disability. (Welf. & Inst. Code, § 4512, subd. (a).) . . . .
> ...................................................................................................................
> There is substantial evidence [Petitioner] has a learning disability. There is no evidence he has a developmental disability.

(Lodged Doc. No. 5, Opinion, at 14-19.)

For the reasons explained by the California Court of Appeal, Petitioner simply failed to present evidence of a developmental disability to require an examination by the director of the regional center. However, as Respondent submits, even assuming the trial court should have ordered the regional director to examine Petitioner, the failure to do so under state law, does not provide a basis for granting federal habeas corpus relief. See Estelle v. McGuire, 502 U.S. at 68; Pulley v. Harris, 465 U.S. 37, 41 (1984); Milton v. Wainwright, 407 U.S. 371, 377 (1972).

///

16

H.      Admission of Testimony During Competency Trial That More Defendants Have Feigned
        Mental Illness Under California's Three Strikes Law

Petitioner contends that his rights to due process and a fair trial were violated by the trial

court's admission of testimony during his competency trial that there have been more competency

hearings and more defendants feigning mental illness since enactment of California's Three Strikes

law.

Petitioner takes issue with the testimony by Dr. Phillip Trompetter, a court-appointed

psychologist, over Petitioner's objection, that he has seen an increase in competency proceedings

pursuant to California Penal Code section 1368 since the enactment of California's Three Strikes

law.  (RT 219-220.)  The objectionable testimony was as follows:

> Q. [Prosecutor]: And you've completed a number of these 1368 evaluations –
>
> competency evaluations specifically for three-strikers?
>
> A. [Trompetter]: Yes.
>
> Q.  Have you seen any of these people with a lack of psychiatric history?
>
> A.  Yes.
>
> Q.  And a general effort to feign mental illness?
>
> A.  I have seen more of what I thought to be malingering of mental illness
>
> since the three-strikes law.

(RT 220.)

As previously stated, the admission of evidence violates a defendant's due process rights only

if there are no permissible inferences that can be drawn from it.  Jammal v. Van de Kamp, 926 F.2d

at 920.  "Even then, the evidence 'must be of such quality as necessarily prevents a fair trial.'"  Id.

The Court of Appeal agreed with Petitioner that it was error to allow Dr. Trompetter to testify

that there was an increase in the number of defendants feigning mental illness since the enactment of

California's Three Strikes law, however, the error was harmless.  Specifically, the Court of Appeal

stated as follows:

> First, Dr. Trompetter was permitted to testify, over [Petitioner's] objection,
> that he had noticed an increase in the number of section 1368 claims since passage of
> the three strikes law, along with an increase in the number of such claims where he
> believed the defendant was malingering.  Second, when [Petitioner] called his

17

1   cellmate Wendell Davis to testify, the prosecutor stated to the court, in front of the
jury, that Davis himself was awaiting "trial on a 1368 issue."  In addition, the
2   prosecutor elicited an admission from Davis that he too was a three-striker.
[Petitioner] did not object in either of these latter two instances.
3        We agree with [Petitioner's] contention that this information about *other*
defendants who have claimed incompetence - - either three-strikers in general or
4   Davis in particular - - was irrelevant to the issue before the jury: whether [Petitioner]
was suffering from a genuine mental disorder, or whether he was malingering.
5   However, we disagree with [Petitioner's] claim the information was "highly
prejudical" insofar as it suggests to the jury [Petitioner] was feigning illness, "in
6   cahoots" with Davis, because that is what three strike defendants often do.
     The improper inference the jury could have drawn from this information, i.e.
7   that [Petitioner] was malingering, was the same one the jury properly could have
drawn from the much greater volume of unobjectionable evidence, and expert
8   testimony, presented at the competency hearing.  Not only did [Petitioner's]
circumstances give him an incentive to feign mental illness, but there was
9   considerable evidence that the symptoms he presented to the psychologists were
inconsistent with a diagnosis of mental illness, and were inconsistent with his
10   behavior on other occasions (as with the probation officer).  Therefore, we conclude
there is no reasonable possibility the jury would have reached a verdict more
11   favorable to [Petitioner] had the disputed information not been presented.

12   Lodged Doc. No. 5, Opinion, at 21.

13        Here, Respondent "acknowledges that there were no permissible inferences that could be

14   drawn from Dr. Trompetter's testimony regarding other 'three strikes' defendants, Respondent

15   maintains that admission of this improper evidence was not of such force as to prevent Petitioner

16   from receiving a fair trial."  (Answer, at p. 25.)  Respondent argues that the prosecution's case that

17   Petitioner was mentally competent was based primarily on the medical evaluations that Petitioner

18   was competent and evidence supporting the fact that Petitioner was able to assist his counsel prior to

19   claiming incompetence.  (RT 370-384.)  As Respondent correctly submits, Dr. Trompetter's

20   testimony regarding the recent increase in competency evaluations was a very minor and brief part of

21   the prosecution's case. The testimony was not reinforced to the jury in closing argument, as the

22   prosecution only briefly referenced the testimony.  (*See* RT 377.)  As such, it simply cannot be said

23   that this testimony prevented Petitioner from receiving a fair trial.  Therefore, Petitioner's due

24   process rights were not violated.

25        Moreover, the error was harmless.  The standard for harmless error on habeas corpus review

26   is whether the error "had a substantial and injurious effect or influence in determining the jury's

27   verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993).  For the same reasons explained by

28   the state Court of Appeal, because "there was considerable evidence that the symptoms [Petitioner]

18

1  presented to the psychologists were inconsistent with a diagnosis of mental illness, and were

2  inconsistent with his behavior on other occasions (as with the probation officer)[,]" the subject

3  testimony did not have a substantial and injurious effect on the jury's determination that Petitioner

4  was mentally competent to continue with the criminal proceedings.  Thus, any error in admitting Dr.

5  Trompetter's testimony was harmless and Petitioner is not entitled to habeas corpus relief.

6  I.      Cruel and Unusual Punishment

7          Petitioner contends that his indeterminate sentence of 25 years to life under California's

8  Three Strikes law constitutes cruel and unusual punishment in violation of the Eighth Amendment.

9  Petitioner also contends that the trial court abused its discretion by failing to strike one or both of his

10  prior convictions.

11         As previously stated, Petitioner was charged with two prior serious felonies - robbery and

12  kidnapping in 1991 - under California's Three Strikes law.  (CT 39-45.)  After the jury found

13  Petitioner guilty of assault with a deadly weapon and petty theft with a prior,[4] the trial court held a

14  bench trial to determine whether the prior conviction allegations were true.  (CT 69; RT 118-133.)

15         Prior to sentencing, Petitioner moved for an order striking one or both of the prior

16  convictions in the interest of justice pursuant to California Penal Code section 1385.  (CT 100-114.)

17  Petitioner argued, among other things, that the prior 1991 guilty plea to robbery and kidnapping were

18  not valid because he was not adequately advised of the future possible sentence enhancement as a

19  result of the plea.  (CT 100-106.)

20         The trial court denied the motion.  (CT 203.)  Consequently, Petitioner was sentenced to an

21  indeterminate term of 25 years to life on count 3 (assault with a deadly weapon), pursuant to

22  California's Three Strikes law, plus a determinate term of one year for having served a prior prison

23  term (Cal. Pen. Code § 667.5(b)).  The court imposed the identical sentence for count 1 (petty theft

24  with a prior), however, it was ordered to be served concurrently with the sentence on count 3.  (CT

25  203, 212-213; RT 503-505.)

26         As Respondent correctly argues, Petitioner's claim that the trial court erred in failing to strike

27

28         [4]  Although Petitioner was also found guilty in count 2 of the lesser included offense of simple assault, this conviction was vacated by the state Court of Appeal.

19

1   one or both of his prior offense, is not cognizable on federal habeas corpus review because it

2   involves purely a question of state law.  Estelle v. McGuire, 502 U.S. at 67-68; Middleton v. Cupp,

3   768 F.2d 1083, 1084-85 (9th Cir.1985).

4          A criminal sentence that is not proportionate to the crime for which a defendant is convicted

5   may indeed violate the Eighth Amendment.  In Rummel v. Estelle, 445 U.S. 263, 100 S.Ct. 1133

6   (1980), the Court upheld a life sentence imposed under a Texas recidivist statute for a defendant

7   convicted of obtaining $120.75 by false pretenses, an offense normally punishable by imprisonment

8   for two to ten years.  Rummel v. Estelle, 445 U.S. 263, 266, 100 S.Ct. 1133, 1135 (1980).  However,

9   because he had two prior felony convictions (for fraudulent use of a credit card and passing a forged

10  check), and had served two prior prison terms, the prosecution chose to proceed under the state's

11  recidivist statute, which carried a life sentence.  Id. The Supreme Court held that Rummel's sentence

12  of life imprisonment *with* the possibility of parole did not violate the Eighth Amendment.  Id. at 365-

13  266, 100 S.Ct. at 1135. (emphasis added).   The Court noted that Rummel had suffered two separate

14  convictions and terms of imprisonment for each prior, that he would be eligible for parole in twelve

15  years, and that under the Texas recidivist statute, prosecutors retained the discretion not to invoke the

16  statute for "petty" offenders.  445 U.S. at 278-81, 100 S.Ct. at 1141.

17         Three years later, the U.S. Supreme Court set forth the criteria for finding a sentence to be

18  cruel and unusual punishment under the federal Constitution and affirmed a decision of the Eighth

19  Circuit holding unconstitutional a sentence of life imprisonment without the possibility of parole for

20  a seven-time nonviolent felony recidivist. Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001 (1983).

21  Applying the proportionality criteria, the Court concluded that Solem's sentence was grossly

22  disproportionate to his crime of uttering a "no account" check for $100.00, even in light of his prior

23  six nonviolent felony convictions: three for third degree burglary, one for obtaining money under

24  false pretenses, one for grand larceny, and one for driving while intoxicated.  Id. at 279-81, 103 S.Ct.

25  at 3004-5.   The Court emphasized that Solem's life sentence was far more severe than the sentence

26  it had considered in Rummel, because Rummel was likely to be eligible for parole in twelve years,

27  while Solem was given no possibility of parole at all. Id.

28         In Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680 (1991), the defendant received a

1   mandatory sentence of life in prison *without* the possibility of parole for possession of more than 650

2   grams of cocaine, his first felony offense.  Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680

3   (1991) (emphasis added).  The U.S. Supreme Court upheld the sentence, with five justices agreeing,

4   for varying reasons, that the sentence did not violate the Eighth Amendment.  Although the Court did

5   not produce a majority opinion, seven justices favored some manner of proportionality review.

6   Justice Kennedy, joined by Justices O'Connor and Souter, stated that a noncapital sentence could

7   violate the Eighth Amendment if it was "grossly disproportionate" to the crime, but concluded that

8   courts need not examine the second and third factors of intrajurisdictional and interjurisdictional

9   reviews discussed in Solem, unless "a threshold comparison of the crime committed and the sentence

10  imposed leads to an inference of gross disproportionality."  Id. at 1005.  The Ninth Circuit, adopting

11  Justice Kennedy's concurring opinion in Harmelin, now refers to the test articulated as "the rule of

12  Harmelin."  Andrade v. Attorney General of the State of California, 270 F.3d 743, 756 (9th Cir.

13  2001).

14       The majority of the justices in the Harmelin court agreed that outside capital punishment,

15  deeming a sentence cruel and unusual punishment is "exceedingly rare" due to the lack of objective

16  guidelines for terms of imprisonment.  Harmelin, 501 U.S. 957, 964, 111 S.Ct. 2680 (1991).  The

17  threshold for such an inference of disproportionality is high.  See, Id. at 1001, 111 S.Ct. at 2707

18  (Kennedy, J. concurring).  Generally, so long as the sentence imposed by the state court does not

19  exceed statutory maximums, the sentence will not be considered cruel and unusual punishment under

20  the Eighth Amendment.  United States v. McDougherty, 920 F.2d 569, 576 (9th Cir. 1990).

21       The Harmelin Court concluded that the defendant's sentence did not meet the threshold

22  factor of "gross disproportionality."  Justice Kennedy stressed the serious nature of Harmelin's

23  offense, stating that the offense "threatened to cause grave harm to society" unlike "the relatively

24  minor, nonviolent crime at issue in Solem."  Harmelin v. Michigan, 501 U.S. 957, 1002, 111 S.Ct.

25  2680, 2705 (1991).  Justice Kennedy further noted that the "possession, use, and distribution of

26  illegal drugs represent 'one of the greatest problems affecting the health and welfare of our

27  population.'" and that the quantity of cocaine possessed by Harmelin had a potential yield of

28  between 32,500, and 65,000 doses.  Id.

In <u>Lockyer v. Andrade</u>, 123 S. Ct.1166 (2003), the Supreme Court discussed the current state of Eighth Amendment proportionality review and held that the only clearly established governing legal principle is that a "gross disproportionality" review applies to criminal sentences for a term of years. <u>Id</u>. at 1173.  Citing extensively to its past cases dealing with criminal sentencing and proportionality under the Eighth Amendment, the Court acknowledged that it has "not established a clear and consistent path for courts to follow." <u>Id</u>.  The Supreme Court held that "the only relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of' frame work is the gross disproportionality principle, the precise contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme' case." <u>Id</u>.

In <u>Ewing v. California</u>, 123 S. Ct.1179 (2003), the Supreme Court again reviewed the Supreme Court's Eighth Amendment jurisprudence, and chose to adopt Justice Kennedy's view [5] that:

> [There are] four principles of proportionality review-- the primacy of the legislature; the variety of legitimate penological schemes; the nature of our federal system; and, the requirement that proportionality be guided by objective factors– that inform the final one: The Eighth Amendment does not require strict proportionality between the crime and the sentence.  Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime.

<u>Ewing</u>, at 1186-1187.   In addition to <u>Andrade</u> and <u>Ewing</u>, the Supreme Court has also upheld a life sentence under Texas's habitual offender statute for obtaining $120 by false pretenses, <u>Rummel v. Estelle</u>, 445 U.S. 263 (1980), and a life sentence without the possibility of parole for possession of cocaine.  <u>Harmelin v. Michigan</u>, 501 U.S. 957 (1991).

Turning to Ninth Circuit case law, in <u>Ramirez v. Castro</u>, 365 F.3d 755 (9th Cir. 2004), the Court held that a 25 year to life sentence under California's Three Strikes law for a third offense of shoplifting a $199 VCR was cruel and unusual punishment because Ramirez's criminal history was "comprised solely of two 1991 convictions for second-degree robbery obtained through a single guilty plea, for which his total sentence was one year in county jail and three years probation." <u>Id</u>. at 758.

---

[5]As expressed in his concurring opinion in <u>Harmelin v. Michigan</u>, 501 U.S. 957, 1001 (1991), *citing* <u>Solem v. Helm</u>, 463 U.S. 277, 288 (1983).

In this case, the appellate court properly applied governing Supreme Court precedent as set forth in Andrade and Ewing. The state court found the 25 year-to-life enhancement for the convictions of petty theft with a prior and assault with a deadly weapon was not so disproportionate as to rise to the level of a constitutional violation. (Lodged Doc. No. 5, Opinion, at 22.) The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Like Andrade and Ewing, Petitioner was convicted on a theft charge. However, distinguishable from both Andrade and Ewing, Petitioner's underlying offenses also included a violent offense - assault with a deadly weapon. In fact, the assault conviction (count 3) was the basis for the "three strikes" sentence, with a concurrent term imposed for the theft conviction (count 1).

In addition, Petitioner had prior convictions for kidnapping, robbery, illegal possession of a handgun, and possession of a controlled substance for sale. (CT 138, 205.) Under California law, both the kidnapping and robbery convictions are serious and violent felonies (Cal. Pen. Code §§ 1192.7(19) & (20) and 667.5(c)(9) & (14)), and are subject to use as a strike under California's Three Strikes law. As noted by the trial court and Respondent, at the time of the triggering offenses, Petitioner had been out of prison for less than two years and was still on parole. (CT 138, 209; RT 502.) As in Andrade, and unlike in Solem, Petitioner's 25 year to life sentence does not preclude the possibility of parole.

Petitioner contends that both of his felonies were "wobblers," chargeable as misdemeanors. He further contends that his two prior strike felonies arose out of the same incident, suggesting that they constituted only one "strike." Petitioner's claims are without merit.

As Respondent correctly argues, in Ewing, the Supreme Court said it was of "no moment" to the Eighth Amendment analysis that defendant's triggering offense of grand theft was a "wobbler." Ewing v. California, 538 U.S. at 28. The Court explained: "Though California courts have discretion to reduce a felony grand theft charge to a misdemeanor, it remains a felony for all purposes unless and until the trial court imposes a misdemeanor sentence." Id. at 28-29 (internal quotations and citations omitted). The Court added, "Under California law, the reduction is not based on the notion that a 'wobbler' is conceptually a misdemeanor. . . . Rather, it is intended to extend misdemeanor

1  treatment to a potential felon." Id. at 29 (internal quotations and citations omitted).  Accordingly,

2  merely because the offense could have been reduced to a misdemeanor does not diminish the gravity

3  and seriousness of the offense.

4       Petitioner's claim that his prior convictions arose from the same course of conduct and

5  should have constituted a single strike, is without merit.  Petitioner relies on California Penal Code

6  section 654, which prohibits dual punishment for the same offense, and California Penal Code

7  section 1385, which allows a judge to strike a prior conviction.[6]  Petitioner's reliance on section 654

8  is misplaced because that section deals with multiple punishments, not multiple convictions.  See

9  People v. McFarland, 58 Cal.2d 748, 762 (1962) (stressing that section 654 "prohibits double

10  punishment, not double conviction").

11       Here, the record demonstrates that the San Mateo County Superior Court imposed

12  consecutive sentences for his 1991 convictions for kidnapping and robbery (see Pet. Exh. A).

13  However, even if the sentence has been stayed under section 654, a subsequent sentencing court may

14  still consider the prior conviction as a "strike" for purposes of California's Three Strike sentencing

15  law.  See People v. Benson, 18 Cal.4th 24, 36 (1998) ("three strikes" law permits, but does not

16  require, a prior qualifying strike to be treated as a strike, even if the sentence on that prior conviction

17  has been stayed pursuant to Pen. Code § 654).[7]  Furthermore, there is no indication that the trial court

18  would have exercised its discretion to strike one of the prior 1991 convictions even if the sentence on

19  one of the priors had been stayed.

20       To the extent that Petitioner argues that the use of the prior convictions breached his prior

21  plea agreement and rendered his current sentence unconstitutional, his claim must fail.  When a plea

22  agreement rests in any significant degree on a promise or agreement of the prosecutor, so that it can

23

24       [6] California Penal Code section 654 states, in relevant part: "An act or omission that is punishable in different ways

25  by different provisions of law shall be punished under the provision that provides for the longest potential term of
   imprisonment, but in no case shall the act or omission be punished under more than one provision."  Cal. Pen. Code § 654(a).
       California Penal Code section 1385 states, in pertinent part: "The judge or magistrate may, either of his or her own

26  motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed."
   Cal. Pen. Code § 1385(a).

27

28       [7] On this basis, as Respondent argues, there is no need for this Court to review the transcripts of Petitioner's 1991
   case, as Petitioner has previously requested.  (Court Docs. 35, 41)

1   be said to be a part of the inducement or consideration, such promise must be fulfilled.  Santobello v.

2   New York, 404 U.S. 257, 22 (1971).  Here, there is no indication that any promise *not* to use the

3   1991 convictions was made during the plea negotiations, nor does Petitioner make any such

4   allegation.   Accordingly, as there is no basis for finding that such a promise was included in the

5   1991 plea agreement, the agreement was not violated by virtue of the current enhancement.

6   Moreover, the sentence imposed under Three Strikes is not additional punishment for the prior

7   convictions, but rather a stiffened penalty for the latest crimes.  See Monge v. California, 524 U.S.

8   721, 728 (1998).

9        To the extent that Petitioner alleges that he had no knowledge at the time of his 1991 plea of

10  the possibility that it could later be used to enhance a sentence, his claim must also fail.  Due process

11  requires that a defendant be informed of all the *direct* consequences of a guilty plea.  Brady v. United

12  States, 397 U.S. 742, 749 (1970).  There is no due process violation where a trial court fails to

13  inform the defendant of *collateral* consequences, such as the potential for enhancement in the future.

14  United States v. Garrett, 680 F.2d 64, 65-66 (9th Cir. 1982).  Thus, Petitioner's lack of knowledge

15  that the 1991 convictions could later be used to enhance a future sentence does not violate due

16  process.

17       In sum, given Petitioner's commitment offense, criminal history, and sentence, this not one of

18  the rare cases in which "a threshold comparison of the crime committed and the sentence imposed

19  leads to an inference of gross proportionality."  Harmelin, 501 U.S. at 1005.  As in Ewing,

20  Petitioner's sentence of 25 years to life is amply justified by the State's public-safety interest in

21  incapacitating and deterring recidivist felons, and is amply supported by Petitioner's prior

22  convictions demonstrating his failure to comply with the law.  Ewing, 538 U.S. at 29-30.

23  J.    Failure to Instruct Jury on Misdemeanor Offense of Exhibiting or Using a Deadly Weapon

24       In addition to arguing that the trial court failed to sua sponte instruct the jury on the defense

25  of accident or misfortune, Petitioner contends that the trial court erred by failing to instruct the jury

26  on a lesser included offense.  Because Petitioner's claim is not entirely clear, the Court construes the

27  claim, as does Respondent, to be that the trial court violated his constitutional rights by failing to

28  instruct the jury on the misdemeanor offense described in California Penal Code section 417(a)(1).

Petitioner's claim is based on a flawed premise: that exhibiting a deadly weapon in violation of California Penal Code section 417(a) is a lesser included offense of assault with a deadly weapon in violation of California Penal Code section 245(a)(1).  Penal Code section 417(a)(1) provides:

> Every person who, except in self-defense, in the presence of any person, draws or exhibits any deadly weapon whatsoever, other than a firearm, in a rude, angry or threatening manner, or who in any manner, unlawfully uses a deadly weapon other than a firearm in any fight or quarrel is guilty of a misdemeanor, punishable by imprisonment in a county jail for not less than 30 days.

California courts have unequivocally and consistently held that exhibiting a deadly weapon is not a lesser included offense of assault with a deadly weapon.  See People v. Escarcega, 43 Cal.App.3d 391, 398 (1974) ("courts of this state have expressly and consistently held that Penal Code section 417 does not cover or define an offense lesser than, and necessarily included within, the crime of assault with a deadly weapon as proscribed by Penal Code section 245").  Therefore, the trial court had no sua sponte duty under state law to instruct the jury on the offense of exhibiting a deadly weapon in violation of California Penal Code section 417 (a)(1).[8]

Moreover, and fatal to Petitioner's claim, the law of this circuit states that "'the failure of a state court to instruct on a lesser offense [in a non-capital case] fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding.'" Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000) (quoting Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984); see also Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998) ("Under the law of this circuit, the failure of a state trial court to instruct on lesser included offenses in non-capital cases does not present a federal constitutional question").

Further, even if Petitioner had requested a jury instruction on the lesser offense outlined in California Penal Code section 417(a)(1), there was no evidence to support such an instruction. California Penal Code section 417(a)(1) prohibits two types of conduct: drawing or exhibiting a

---

[8]  The trial court instructed the jury on the lesser included offense of simple assault (Cal. Pen. Code § 240) in connection with two of the three charges - assault by means of force likely to produce great bodily injury and assault with a deadly weapon, counts 2 and 3 respectively.  (CT 62.)  The jury found Petitioner guilty as charged on counts 1 and 3, and not guilty on count 2, but guilty of the lesser offense of simple assault.  (CT 68-72.)  On direct appeal, the Court of Appeal vacated that misdemeanor conviction on the ground that counts 2 and 3 were simply variations of the same offense.  (Lodged Doc. No. 5 at 4-8.)

1    deadly weapon other than a firearm in a rude, angry or threatening manner; and unlawfully using a

2    deadly weapon other than a firearm in any fight or quarrel.  At trial, there was no evidence that

3    Petitioner drew or exhibited the lock set box in a rude, angry or threatening manner before releasing

4    it.  The undisputed evidence was that Petitioner threw the box at the security guard as soon as he

5    removed it from his waistband.  (RT 37-39, 49, 64-68.)  Nor was there evidence that Petitioner and

6    the security guard were engaged in a fight at the time he threw the box.  Accordingly, even if

7    Petitioner had requested the instruction, such request would have been denied as it was not supported

8    by the evidence.

9    K.      Ineffective Assistance of Trial Counsel

10          Petitioner contends that he received ineffective assistance of counsel from both of his

11   attorneys in the trial court.  Specifically, Petitioner contends that trial attorney, Maria Arevalo,

12   should have offered a defense based on accident or misfortune, and argued that Petitioner was guilty

13   of nothing more than a misdemeanor under California Penal Code section 417(a)(1).  Petitioner

14   further contends that Arevalo failed to present an adequate defense to the prior conviction

15   allegations.  With regard to his second attorney, Corenlio Hernandez, Petitioner contends that

16   counsel should have prevented the psychologists who testified at his post-trial competency hearing

17   from referring to his status as a "three strikes" inmate.  Petitioner further claims that Hernandez

18   failed to present proper evidence to support his post-trial motion to strike Petitioner's prior

19   convictions.

20          The law governing ineffective assistance of counsel claims is clearly established for the

21   purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe, 151

22   F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective assistance

23   of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S. 668, 687, 104

24   S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must

25   show that counsel's performance was deficient, requiring a showing that counsel made errors so

26   serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.

27   Strickland, 466 U.S. at 687.  The petitioner must show that counsel's representation fell below an

28   objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were

1    not the result of reasonable professional judgment considering the circumstances. Id. at 688; United

2    States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's

3    performance is highly deferential.  A court indulges a strong presumption that counsel's conduct falls

4    within the wide range of reasonable professional assistance.  Strickland, 466 U.S. 668, 687, 104

5    S.Ct. 2052, 2064 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

6        Second, the petitioner must show that counsel's errors were so egregious as to deprive

7    defendant of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  The court must

8    also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's

9    ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356,

10   1461 (9th Cir. 1994).  More precisely, petitioner must show that (1) his attorney's performance was

11   unreasonable under prevailing professional norms, and, unless prejudice is presumed, that (2) there is

12   a reasonable probability that, but for counsel's unprofessional errors, the result would have been

13   different.

14       A court need not determine whether counsel's performance was deficient before examining

15   the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Strickland, 466 U.S.

16   668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove prejudice, any deficiency that

17   does not result in prejudice must necessarily fail.  Ineffective assistance of counsel claims are

18   analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362 (2000).

19   Weighall v. Middle, 215 F.3d 1058, 1062 (2000).

20       Tactical decisions of trial counsel are entitled to deference when counsel makes an informed

21   decision based on strategic trial considerations and the decision appears reasonable under the

22   circumstances.  Sanders v. Ratelle, 21 F.3d at 1456.

23       1.    Ineffective Assistance of Trial Counsel Maria Arevalo

24       As previously stated, Petitioner contends that trial counsel Arevalo was ineffective for (1)

25   failing to argue for an acquittal, or conviction on a lesser offense, based the defense of accident and

26   misfortune; (2) failing to request a jury instruction based on the defense of accident or misfortune;

27   and (3) failing to raise an adequate defense to the prior convictions during the bench trial.

28       At trial, Arevalo argued that Petitioner threw the lock set box at Magana in an attempt to

escape from being caught for shoplifting and he did not harbor any intent to cause injury.  (RT 93-95.)  Counsel pointed out that Magana's injury was relatively minor, and questioned the veracity of his testimony by pointing out certain inconsistencies between his trial testimony and his report of the incident.  (RT 91-93.)

As previously stated, after Petitioner was found guilty, he filed a motion for a new trial on the grounds that Arevalo failed to present evidence of his mental condition and history of a severe learning disability.  (CT 85-97.)  The trial court denied the motion.  (CT 203.)

As Respondent correctly argues, counsel did have a sufficient basis to effectively argue that Petitioner did not intend to throw the lock set at Magana.  In fact, counsel attempted to elicit testimony from Magana that Petitioner threw the lock set to him, and not at him.  However, as previously noted, Magana unequivocally testified that Petitioner threw the lock set at him, causing injury.  (RT 51, 55-56.)  Moreover, the fact that Magana suffered an injury just above his left eye, and Magana's description of Petitioner throwing the lock set in an overhand wind-up motion, greatly undermined the claim that Petitioner meant only to distract the security officer.

The defense of accident, under California law, "is a claim that the defendant acted without forming the mental state necessary to make his actions a crime." People v. Gonzales, 74 Cal.App.4th 382, 390 (1999).  The crime of assault with a deadly weapon does not require an intent to injure or violate the law, but only "the general intent to willfully commit an act the direct, natural and probable consequences of which if successfully completed would be the injury to another." People v. Colantuono, 7 Cal.4th 206, 214 (1994); see also People v. Williams, 26 Cal.4th 779, 788 (2001) (to be convicted of assault with a deadly weapon, a defendant "need not be subjectively aware of the risk that a battery might occur").

As Respondent argues, the only way to effectively argue the defense of accident or misfortune would have been to show that Petitioner did not intend to throw the lock set box toward Magana in any manner.  However, Petitioner's defense would have been directly contradicted by the eyewitnesses testimony provided by security officers Magana and Keo.  Therefore, because such a defense would have been clearly rebutted by the evidence, Arevalo did not perform deficiently by failing to raise this defense, and Petitioner has not, and cannot, demonstrate any resulting prejudice.

29

1   Additionally, there was no basis for the jury to be instructed on the misdemeanor offense of

2   exhibiting a deadly weapon in violation of California Penal Code section 417(a)(1).

3       Moreover, because there was not sufficient evidence to support Petitioner's defense theory

4   that he hit Magana by accident, Arevalo was not ineffective for failing to request an instruction on

5   the defense of accident or misfortune as defined by CALJIC No. 4.45.[9]  Consequently, Petitioner has

6   not, and cannot, demonstrate that he was prejudiced by counsel's failure to request such instruction.

7       With regard to Petitioner's claim that Arevalo rendered ineffective assistance by failing to

8   mount a defense to the prior conviction allegations during the bench trial, it is likewise without

9   merit.  Respondent recognizes "that Arevalo did not present any witnesses during the bifurcated

10  proceeding, conducted limited cross-examination of the government's sole witness, and waived

11  argument.  (RT 127-133.)."  However, even assuming counsel was ineffective, Petitioner has not

12  established the requisite prejudice under Strickland.

13      First, Petitioner does not dispute that he was the individual identified in the prison records as

14  having committed the two prior felonies of robbery and kidnaping.  Petitioner contends that counsel

15  should have challenged the prior convictions on the ground that he plead "nolo contendere" not

16  guilty.  However, under California law, a plea of no contest or "nolo contendere" has the same legal

17  effect as a plea of guilty.  See Cal. Pen. Code § 1016 ¶ 3 ("The legal effect of such a plea, to a crime

18  punishable as a felony, shall be the same as that of a plea of guilty for all purposes.").  Beyond this

19  unfounded claim, Petitioner fails to explain what basis or evidence counsel should have presented to

20  negate the effect of his no contest plea.  As such, Petitioner has not, and cannot, demonstrate any

21  resulting prejudice and his claim fails on the merits.  See Strickland, 466 U.S. at 697; Williams v.

22  Calderon, 52 F.3d 1465, 1470 n.3 (9th Cir. 1995).  Additionally, Petitioner's claim that counsel

23  "inappropriately" convinced him to waive his right to a jury trial on the prior conviction allegations

24  is without merit.  Petitioner has failed to satisfy his burden of demonstrating prejudice by showing

25  that he would fared any better with a jury, rather than a bench trial.

26  _____

27      [9]  CALJIC No. 4.45 states: "When a person commits an act or makes an omission through misfortune or by accident
    under circumstances that show [no] [neither] [criminal intent [n]or [[criminal] negligence,] [he][she] does not thereby commit
28  a crime."

2.      Ineffective Assistance of Counsel Cornelio Hernandez

As previously stated, Petitioner contends that counsel Hernandez was ineffective for failing to object to the pychologists testimony regarding his status as a "three strikes" inmate, and for failing to adequately challenge the prior convictions in the motion to strike by presenting a copy of the preliminary hearing transcript in support of the motion.

Cornelio Hernandez represented Petitioner at the competency hearing held after the finding of guilt, but prior to sentencing.  Petitioner was examined by two court-appointed psychologists, Dr. Gary Zimmerman and Phil Trompetter.  (RT 157.)  In an effort to demonstrate Petitioner's incompetence, Hernandez asked Dr. Zimmerman whether Petitioner was aware that he was a "three strike" defendant, to which Petitioner responded that he had "no strikes."  (RT 182.)  Dr. Zimmerman found Petitioner's response to be unusual since Petitioner was wearing a yellow jumpsuit signifying his status as a "three-strikes" inmate in the jail.  (RT 182-183.)  From this response, Dr. Zimmerman found that Petitioner was not aware of the nature of the proceedings against him because "if he truly [didn't] know he was at risk that is a point of incompetence."  (RT 183.)  Dr. Zimmerman concluded, based in part on Petitioner's unawareness of the nature of the proceedings, that Petitioner was probably incompetent, and should be sent to a hospital for further evaluation.  (RT 174-175.)  As Respondent correctly submits, counsel clearly had a good reason to ask Dr. Zimmerman about Petitioner's status as a three-strike inmate as the response supported the claim that Petitioner was incompetent.  Counsel therefore had a reasonable tactical decision to question Dr. Zimmerman on this issue, and such decision is entitled to deference.  Sanders v. Ratelle, 21 F.3d at 1456.

Psychologist, Phil Trompetter, testified on behalf of the prosecution.  As Respondent points out, in direct examination, the prosecutor attempted to use Petitioner's status as a three-strikes inmate to show that he had a motive to fake incompetency.  Specifically, the prosecutor asked Dr. Trompetter whether he had seen an increase in the number of defendants claiming incompetence after the three-strikes law was passed, over Hernandez's objection, Dr. Tropetter indicated that he has seen an increase.  (RT 219.)  Defense counsel certainly was competent by raising a timely objection to such testimony, the fact that it was overruled by the trial court, cannot demonstrate

1   incompetence on the part of counsel.

2          Petitioner's claim that counsel should have prevented the psychologists from learning his

3   three-strikes status to prevent any resulting bias in their assessment of his competency, is without

4   merit.  Petitioner fails to demonstrate why the physicians could not make an objective assessment of

5   him merely because they were aware of his sentencing status.  In fact, it was to Petitioner's

6   advantage, as Dr. Zimmerman used the information in support of his conclusion that Petitioner was

7   incompetent.  Accordingly, Petitioner has failed to demonstrate that counsel was incompetent or that

8   he suffered any resulting prejudice.

9          With regard to Petitioner's claim that Hernandez was incompetent by failing to submit a copy

10  of the preliminary hearing transcript in support of the motion to strike the prior convictions, his

11  claim is likewise without merit.   After Petitioner was found competent, but prior to sentencing,

12  Hernandez filed two separate motions to strike the prior felony convictions, on the ground that at the

13  time of 1991 plea he was unaware that the conviction could be used later to enhance his sentence and

14  the trial court should exercise its discretion to strike one or both of the prior convictions pursuant to

15  California Penal Code section 1385.  (CT 108-121.)

16         As discussed under section I, Petitioner's claim appears to be premised on the theory that

17  because his prior convictions arose from the same incident and should have been stayed under

18  California Penal Code section 654.[10]  It appears that Petitioner contends that the preliminary hearing

19  transcript would have supported his claim that he was improperly sentenced.  Not so.

20         As explained under section I, the record demonstrates that the San Mateo County Superior

21  Court imposed consecutive sentences for his 1991 convictions for kidnapping and robbery (see Pet.

22  Exh. A).  However, even if the sentence has been stayed under section 654, a subsequent sentencing

23  court may still consider the prior conviction as a "strike" for purposes of California's Three Strike

24  sentencing law.  See People v. Benson, 18 Cal.4th 24, 36 (1998) ("three strikes" law permits, but

25  does not require, a prior qualifying strike to be treated as a strike, even if the sentence on that prior

26

27         [10]  As previously noted, the record indicates that Petitioner was sentenced to eight years plus a five-year firearm
    enhancement for the kidnapping charge, and a consecutive one year on the robbery charge, for a total of 14 years.  (CT 109,
28  119-120.)

1    conviction has been stayed pursuant to Pen. Code § 654).[11]  Furthermore, there is no indication that

2    the trial court would have exercised its discretion to strike one of the prior 1991 convictions even if

3    the sentence on one of the priors had been stayed.

4          Hernandez's  strategic choice to argue that the circumstances of the present offense as well as

5    his limited learning ability, supported a basis for the trial court to exercise its discretion to strike one

6    or both of the prior convictions, was reasonable.  (CT 108-121.)  In addition, Petitioner has failed to

7    demonstrate that there is a reasonable probability that he would have received a more favorable

8    sentence if counsel had submitted a copy of the preliminary hearing transcript, and his claim fails

9    under Strickland.

10   L.      Cumulative Error

11         Petitioner contends that even if the prejudice from any individual constitutional error was

12   harmless, the cumulative prejudice from the various alleged errors is sufficient to warrant habeas

13   relief.  "Multiple errors, even if harmless individually, may entitle a petitioner to habeas relief if their

14   cumulative effect prejudiced the defendant."  Ceja v. Stewart, 97 F.3d 1246, 1254 (9th Cir. 1996)

15   (citing Mak v. Blodgett, 970 F.2d 614, 622 (9th Cir. 1992)).  Because the single arguable error in this

16   case - the admission of the testimony by Dr. Trompetter regarding the tendency of "three strike"

17   defendants to claim incompetency - has been found to be harmless, there are no errors to cumulate to

18   such a degree of a constitutional violation.  "One error is not cumulative error."  United States v.

19   Sager, 227 F.3d 1138, 1149 (9th Cir. 2000).  Accordingly, Petitioner's claim of cumulative error is

20   without merit.

21                              RECOMMENDATION

22         Based on the foregoing, it is HEREBY RECOMMENDED that:

23         1.      The instant petition for writ of habeas corpus be DENIED; and

24         2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

25         This Findings and Recommendations is submitted to the assigned United States District

26   Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the

27

28         [11]  On this basis, as Respondent argues, there is no need for this Court to review the transcripts of Petitioner's 1991
     case, as Petitioner has previously requested.  (Court Doc. 35, 41.)

33

1    Local Rules of Practice for the United States District Court, Eastern District of California.  Within

2    thirty (30) days after being served with a copy, any party may file written objections with the court

3    and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate

4    Judge's Findings and Recommendations."  Replies to the objections shall be served and filed within

5    ten (10) court days (plus three days if served by mail) after service of the objections.  The Court will

6    then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are

7    advised that failure to file objections within the specified time may waive the right to appeal the

8    District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9

10        IT IS SO ORDERED.

11   **Dated:    September 20, 2007            /s/ Dennis L. Beck**
                                        UNITED STATES MAGISTRATE JUDGE